PRO YO STY, J.
Plaintiff sues for a dissolution of partnership, and to have a 10 per cent, interest, which defendant acquired in his own name in the Star Company, decreed to belong to the partnership, and for an accounting from defendant of the dividends theretofore received by him from said company.
At the time of entering into the agreement *632 which plaintiff calls a “partnership,” the plaintiff was vice president oí a bank in Houston, Tex., and defendant was a man of large experience in and about oil fields, and skilled in oil well drilling. For some two or three years they had been operating in the oil field of Humble, Tex., under an arrangement by which plaintiff furnished the money and defendant his services. The exact nature of the business is not stated, but, as we gather, consisted in trafficking in oil leases and prospecting for oil. The business had been unsuccessful. Plaintiff had sunk in it some $30,000. We gather that it had been discontinued; for defendant testifies that, having heard of the oil prospects at Vinton, La., he decided to go there, and sought to borrow $150 for that purpose. And the witness Birmingham, who lent him the $150, on a note indorsed by the plaintiff, says that defendant was “up against it,” meaning, as we understand, without means and out of employment. With reference to the terms and conditions of the agreement which forms the basis of this suit, plaintiff testified as follows:
“Q. What was that agreement?
“Á. I was to advance Emerson $25 a week to come to Vinton and see if we couldn’t secure some leases or rights, or something of the sort. ........
“Q. As we understand from your answer, there was no fixed time for the duration of that partnership?
“A. No.
“Q. Mr. Hamman, at the time that you made this agreement with Mr. Emerson to advance him $25 a week, was he to give you all of his time, or only a portion of his time?
“A. Why, until we made some other agreement about it, he was.
“Q. He was to give you all of his time until you made some other agreement?
“A. Yes, sir.
“Q. Now, Mr. Hamman, in the event the operations liad been successful, what compensation was Mr. Emerson to receive for his time, or was anything said about time?
“A. No, there was nothing said about that. He was to have half of what we made.
“Q. Half net?
“A. Yes, sir.
“Q. Am I to understand from that that you were to have returned to you $25 a week that you advanced, or whatever sum you might advance, Mr. Emerson was to get no compensation for his time, and then, after the funds were returned to you, that you were to divide, or if' your advances were to be offset by Mi-. Emerson’s time and the gross receipts were to be divided?
“A. The amounts were advanced to him—
“Q. In other words, you were putting up-your money against his time?
“A. Yes, that was the proposition.
“Q. And if you made anything out of it, you divided it, and, if you made nothing out of it,, ycu lost your money and he lost his time?
“A- Yes; you understand that was this Vinton deal.
“Q. Mr. Hamman, were there any details arranged as to the period of time which you were to furnish Mr. Emerson with $25 a week?
“A. No, sir.
“Q. Was there any amount which you fixed as the maximum amount which he was to-spend ?
“A. As long as it did not run over any reasonable amount.
“Q. You felt that you had the right to stop it any time you wished if he was drawing too heavily on you?
“A. I would not have felt the right, unless I had taken the matter up with him about it. I had some understanding about it, and we did have an understanding about it.
“Q. When was that understanding?
“A. Some time after November, 1912, when he got this work with the Producers’ Oil -Company.
“Q. You had no intention of doing any actual drilling yourself, but simply of procuring some leases or options on land and turning them over to some company to develop?
“A. Never had any intention of spending but a small amount of money just for his expenses to try to find some leases and make some trade with some other large companies, get an interest in the leases, that was the agreement.
“Q. From the time that he first went to Vinton, September, 1909, until the time he went into the employ of the Ninety-Nine Company, he was doing nothing but scouting for you, was he? ,
“A. He was scouting for us both.
“Q. At the time Mr. Emerson left Houston to go to Vinton, it was your understanding that whatever leases he might take that he might take them in his own name?
“A. Yes, sir.
“Q. In his name and not your name; they were not to be taken in the name of Hamman and Emerson, were they?
“A. It was understood he was taking them in his own name.
“Q. And you have used the word ‘partner' in discussing the matter with him, did you?
“A. The word -‘partner’; yes, sir. 'JVe have- *634 used it a hundred times about how we were going to get out.
“Q. Your name wasn’t to appear on the surface?
“A. No, it wasn’t to appear.
“Q. You were to furnish the money, and whatever interest that might be acquired was to be acquired in Mr. Emerson’s name, and be sold and transferred in his name, and you Were to get half of the proceeds; is that correct ?
“A. Yes, that was my understanding.
“Q. What was the agreement when Emerson went to Vinton with reference to obligations that Emerson might incur in his own name, and about which he would not consult you as to your liability?
“A. Why, there was not to be any obligations on my part, except this $25 a week, or a little more than that, that I gave him.
“Q. Was there anything said, at the time this partnership was formed between you gentlemen, as to whether your name was to be used or not? Was there anything said whether his name was to be used?
“A. No, there wasn’t anything said about that.”
The defendant testified as follows:
“Q. Mr. Emerson, when did you go to the Vinton field?
“A. In September, 1909. I don’t remember, exactly, what date, but the middle or the first of September; in September-, anyway.
“Q. State to the court how you happened to go there?
“A. Well, I met a friend of mine named Henry Filmer, who was at that time traveling for the Southern Well Works. Met him in Houston one day, and he told me that he had just been to Vinton and said that was the best looking proposition that he had ever seen. He said—
“Q. Where did you go then?
“A. Well, I went to Mr. Hamman, and I told him that I wanted to borrow, I believe, $150 from him, something like that; said I wanted to go to Vinton to see if I could pick up something over there. Might get hold of some leases or something.
“Q. Did he arrange for you to get the $150?
“A. No, he told me that he had a little money, and I believe I left then and I saw Mr. Bingham, and asked him — if I remember correctly, Mr. Hamman told me that he would indorse a note, if I could borrow the money somewhere, and I saw Mr. Bingham, and I asked him if he would take my note for $150, indorsed iby Mr. Hamman. I don’t remember what length of time the note was drawn for, and he said he would. Consequently, I got the $150. I don’t remember whether it was just a day before ; I mean, I don’t know whether it was the day after I started to Vinton, but in the course cf a few days, not very long — I don’t — the date cf the note.
“Q. How was that $150 used?
“A. Why, I came over here — expenses.
“Q. Used in the Vinton field for coming over there?
“A. Yes. sir.
“Q. Who afterwards paid the note?
“A. I paid the note myself.
“Q. Now, Mr. Emerson, did you have any arrangement with Mr. Hamman about getting expense money?
“A. Why, he said, ‘Go over there and see What you can do, see if you can get some leases, make some trades of some kind,’ and I don’t know as we made any agreement right there, but it was understood by mutual understanding, I suppose, I don’t remember that we ever came to any agreement. I agreed to split any interest I was taking with him, but I don’t know that we came out and made any verbal agreement. But it was my intention, in fact I never dreamed of doing anything else, but splitting the interest that I obtained with him.
_ “Q. Mr. Emerson, state whether or not any time in your conversation with Mr. Hamman it was agreed that you and he werq to go into the drilling operations sinking wells in the Vinton field?
“A. No, he told me that he wouldn’t stand to spend that much money. Told me if I could take any leases or anything of that kind and get them drilled on, get an interest in it.
“Q. Why should Mr. Hamman pay your necessary expenses?
“A. Well, there was an understanding with us that I was to come over here and get leases and there would be a joint account. I don’t remember how the understanding was ever framed up. That was our general understanding.”
Defendant went to the Vinton oil field, and acquired there, for the joint account of himself and- plaintiff, a 10 per cent, interest in a lease transferred by the Sabine Oil & Mineral Company to the Ninety-Nine Company; also, a 10 per cent, interest of a lease of 10 acres made by A. J. Vincent to the same Ninety-Nine Company; and, also, a 10 per cent, interest in a lease of 40 acres from E. T. Perry to the same Ninety-Nine Company. Up to February, 1910, the plaintiff furnished him all the money for his expenses. At or about that date, he entered the employ of the Ninety-Nine Company in consideration of the company paying his livery expenses and railroad fare; and he wrote to plaintiff that plaintiff would not henceforth have to fur *636 nish him more than $75 or $80 per month. In July, 1910, he entered the employ of the Producers’ Oil Company, at $150 per month. In November, 1910, he and plaintiff had a conversation in plaintiff’s office in Houston, Tex. Regarding this conversation, plaintiff testified as follows:
“Q. Just relate the conversation between you and Mr. Emerson at that time, as you remember it.
“A. Well, we had this interest with the Ninety-Nine Company, had this partnership interest. Emerson came over there, and, of course, I had advanced him quite a lot of other moneys, and I told him, ‘You have been employed since June and still drawing on me, you are not treating me right.’ He said: T have been a little bit hard on you, but of course I have got a job now, and I won’t have to draw on you for any other money; I can get along all right.’ ‘Well,’ I said, ‘if that is the way you feel about it, you have made it pretty hard for me; let’s see if we can’t get along and work these wells out and get the money out of them.’ ”
Touching this conversation, defendant testified as follows:
"Q. Mr. Emerson, the arrangement which existed between you and Mr. I-Iamman at the time you acquired the interest in the Sabine Oil & Mineral Company’s leases, and also in the Vincent lease transferred to the Ninety-Nine Company, was that arrangement ever terminated, and, if so, when?
“A. Why, I don’t know what you would call the arrangement, contract, or what you would call it — I believe some time in November.
“Q. What year?
“A. 1910. Of course, when we first got it, it looked like we had a chance to get rich, with that 10 per cent. But I suppose he had no money. I had been spending more money that I should have been spending, so I told him, ‘No.’ I said, ‘This thing don’t look as promising as it did at first,’ and I said: T will cut these expenses out, I won’t draw on you for any other money.’
“Q. What was it he asked you just before that?
“A. I don’t know what you mean.
“Q. State whether or not he made any request of you to discontinue the advancing of the expense money?
“A. Why; yes, sir. He requested me to ; yes, sir.
“Q. Now how were you living at that time? Where were you getting the funds you were living on?
“A. I was drawing a salary then from the Producers’.
“Q. How much?
“A. I believe $200 a month.”
In June, 1912, one J. G. Sutton, having obtained an oil lease from one Armogene Vincent, approached defendant to join him and others in organizing a company to develop, the leased property; and he and defendant and two others organized the Star Company. Defendant contributed $1,000 to the capital of this company, and received 22% per cent., of the capital stock of the company. The-first well that this company put down proved a failure; but the second and the third came in as gushers, and the profits were very' large. A few days after the first gusher had come in, plaintiff claimed to be half owner of defendant’s interest, and, upon the refusal of defendant to recognize him as such, brought this .suit.
The amount involved is large, and the case has been very elaborately argued, both in oral argument and in brief; but it is a very simple one.
[1] In the first place, the testimony of plaintiff, that defendant was to give all his time to the business for which he had gone to the Vinton field, does not necessarily mean that there was an express understanding to that effect. It merely gives plaintiff’s understanding of the matter. And we see that the defendant’s impression, or understanding, of it was not the same; but, on the contrary, was that he had no express agreement with plaintiff upon anything, except that plaintiff was to defray his expenses, and was to get a half interest in any leases he might succeed in securing.
In the next place,, even if the understanding liad been that defendant was to give all of his time to the business, it would not necessarily follow from this that he would not be at liberty to join in the organization of a corporation and acquire part of the *638 stock of such corporation, so long as his doing so took up no part of his time due to his business with plaintiff or did not conflict therewith.
Nothing shows that this Star Company venture of defendant’s took up any part of defendant’s time; and it did not conflict with the business with plaintiff, for it was a drilling proposition, and the plaintiff testifies that defendant was not to involve him in any drilling operations. Nor can it be said that defendant violated any good faith in not proposing to plaintiff to go into the venture with him, for, as he testifies, he had-on a previous occasion gone to plaintiff with a similar proposition, in connection with a lease held by the Sabine Oil & Mineral Company, and plaintiff’s answer had been:
“No, I haven’t got the money to spend on any operations of that kind; haven’t got the money to do that with.”
[2] Then, again, the manner of carrying out the agreement shows conclusively that neither of the parties considered that all of defendant’s time was due under it. Por we find that the defendant, without consulting plaintiff, accepted employment with the Ninety-Nine Company, by which a great part, if not all, of his time was to be due to that company; and soon thereafter accepted employment with the Producers’ Company at $150 a month, by which all of his time was to be due to that company; and that plaintiff when informed of these arrangements made no demur, nor in any way suggested that they were in conflict with the existing agreement.
[3] But even if the relations of the parties, under their so-called partnership, had been such that any interest thus acquired by the defendant would in equity have inured to the benefit of the partnership, we agree with the defendant that this partnership relation came to an end when, in November, 1910, the parties agreed that plaintiff should furnish no more money. This furnishing of money was the sole consideration of the agreement on the part of plaintiff; he was to do absolutely nothing else; when therefore they agreed that he should no longer furnish money, they necessarily, ipso facto, agreed that the agreement was at an end. Surely, the agreement could not be that plaintiff should owe, or do, nothing; but that defendant should nevertheless owe all of his time and energies to plaintiff or to the so-called partnership.
And it was one year and a half thereafter— one year and a half after defendant had entered the service of the Producers’ Company, and thereby, to the knowledge of plaintiff, contracted all of his time and energies to that company — that this Star Company was formed. The first well sought to be put down by that company proved a failure, and the company found itself heavily involved. There cannot be much doubt, under the evidence, what the answer of plaintiff would have been if the defendant had, after this failure of the first well, informed him of his having gone into this venture and risked $1,000 in it, and called upon him to furnish this $1,000. But it is after success has come, and the $1,000, instead of being lost, has multiplied, that the plaintiff puts forward his claim.
Plaintiff’s demand is sought to be supported by admissions which plaintiff and several other witnesses testify the defendant made to them of plaintiff’s having an interest in this Star Company. Defendant denies having made any such admission; and, as he well says, he could not have made admissions, contrary to the truth. Plaintiff and defendant had a joint interest in several of the leases held by the Producers’ Oil Company; operations were going on under these leases; the charitable view to take is that whatever defendant may have said to these witnesses, touching his joint interest with plaintiff and his having the financial backing of plaintiff *640 had reference to these interests, and not to the Star Company, in which, as the facts in this case show, the plaintiff had not, and was not, backing him, and had not and could not possibly have any interest.
Plaintiff furnished to defendant some $2,-000 under said agreement, and has received no returns therefrom; but plaintiff himself says that the investment was a good one from the appearance of things at that time, and that he would, under like circumstances, make it again.
[4] After the case had been tried, and continued for argument,, plaintiff asked that it be reopened for the purpose of taking evidence alleged to have been newly discovered, touching an interest said to have been acquired by defendant for the partnership in a certain oil lease from one John G. Gray; and the court denied the request. It did so properly, we think. The suit was for an interest in the Star Company, and for dividends received from that company; and the only use of such evidence would have been to serve to throw discredit upon defendant and his testimony. We shall, however, reserve to plaintiff the right to sue for any interest the said so-called partnership may have acquired under the said Gray property lease.
We will add that we do not wish to be understood as having passed upon the question of the admissibility of parol evidence to prove the so-called partnership contract between plaintiff and defendant. Having concluded that the decision would have to go against plaintiff even if such evidence was admissible, we have found it unnecessary to pass upon that question.
Judgment affirmed, with right reserved to plaintiff to sue for any interest he may have growing out of the Gray property lease referred to in the motion to reopen case. Plaintiff to pay the costs of appeal.